1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   MARCOS VALDEZ MORAN,                  ) Case No.: 1:08-cv-01788 AWI  JLT (HC)
                                           )
12                    Petitioner,          ) FINDINGS AND RECOMMENDATIONS TO
                                           ) DENY PETITION FOR WRIT OF HABEAS
13         v.                              ) CORPUS (Doc. 1)
                                           )
14   KEN CLARK,                            ) ORDER DIRECTING THAT OBJECTIONS BE
                                           ) FILED WITHIN TWENTY DAYS
15                    Respondent.          )
                                           )
16   _____

17         Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19                          **PROCEDURAL HISTORY**

20         Petitioner is in custody of the California Department of Corrections and Rehabilitation serving

21   a sentence of 15 years to life for second degree murder, two consecutive terms of life plus 25 years to

22   life for two counts of attempted murder with an enhancement and two concurrent sentences of 15

23   years to life for two counts of shooting at an inhabited building plus a term of 25 years to life for an

24   enhancement.  (Doc. 33-1 at 1) Other sentences as to other counts were stayed. Id.

25         Petitioner filed a direct appeal in the California Court of Appeals, Fifth Appellate District ("5th

26   DCA").  (Doc. 33-1 at 1)  On September 5, 2007, the 5th DCA affirmed Petitioner's conviction though

27   it modified the sentence on the murder charge to a sentence, which is reflected above.  Id. at 12.

28   Petitioner's petition for review was denied by the California Supreme Court on April 16, 2007.

1    (Lodged Document ("LD") 8)  Thereafter, Petitioner filed a petition for writ of habeas corpus in the

2    California Supreme Court alleging ineffective assistance of trial and appellate counsel and

3    insufficiency of the evidence on April 25, 2008 (LD 9) which was denied on October 28, 2008 (LD

4    10).

5           On November 18, 2008, Petitioner filed the instant petition.  (Doc. 1) Respondent's answer

6    was filed on June 8, 2011.   (Doc. 34)  On July 13, 2011, Petitioner filed his Traverse.  (Doc. 37)

7                                        **FACTUAL BACKGROUND**

8           The Court adopts the Statement of Facts in the 5th DCA's partially published decision:

9           At approximately 9:00 p.m. on August 2, 2004, Danielle Olivera was standing
     outside the home of Philip and Marie Marquez in Visalia. [Footnote] Danielle saw a red
10   Mercury Cougar approaching the house at a high rate of speed. The Cougar attempted
     to make a U-turn in front of the house. It turned too wide and hit the side of Danielle's
11   van. As the Cougar drove away, Danielle and Marie got into the van and followed the
     Cougar to learn its license plate number. After following the Cougar for a few blocks,
12   Danielle saw the Cougar stop and saw three men get into the vehicle.
            Meanwhile, Brenda Navarro and her husband, Edgar Rodriguez, were standing
13   in the driveway of a house belonging to Brenda's mother. Appellant and Bernabe Rayo
     were also standing in front of the house. Brenda testified that Mariano Silva drove up in
14   a Cougar and stopped. Mariano, Edgar and appellant were Sureno gang members.
     Mariano was angry and told them that "Mario got hit." Mariano asked to borrow a gun.
15   Edgar testified that appellant replied, "I have one."
            Appellant, Edgar and Bernabe got into the Cougar. Brenda testified that she
16   thought appellant was seated behind the driver; however, Edgar testified that appellant
     sat in the front passenger seat, he sat in the back seat on the passenger side and Bernabe
17   sat in the back seat behind the driver. [Footnote]
            Edgar testified that Mariano told them that some Nortenos had beaten up Mario.
18   He and the other men in the car were angry and they "were gonna go and get him."
     Edgar had a nine-millimeter handgun tucked in his waistband. Mariano also told them
19   that he had collided with a van.
            The Cougar turned onto West Prospect Avenue. Moses Jauregui, Daniel Wright
20   and Owen Bruce were standing outside a residence located at 1725 West Prospect.
     Moses is an active Norteno gang member and Daniel is a Norteno associate. Edgar
21   testified that Mariano pointed at the three men and said, "Look." Then he slowed down.
     Edgar recognized one of them as a Norteno gang member. Bernabe and appellant
22   began shooting at the three men. Appellant reached out of the passenger window and
     fired a handgun over the top of the car. Bernabe fired his revolver through the open
23   driver's door window. Edgar did not point his gun, remove his gun from his waistband
     or fire at the three men.
24          Danielle testified that after the Cougar stopped and three men got inside, it
     made a U-turn and passed her van. Danielle continued following the Cougar from a
25   distance in her van. She was almost close enough to the Cougar to get the license plate
     number when she saw someone shooting from inside the Cougar. She heard gunshots
26   and saw three or four muzzle flashes. Danielle thought that the men in the Cougar were
     shooting at Marie and her, so she turned the van around and drove away.
27          Bruce was shot in the chest and died. The fatal wound was consistent with a
     .45-caliber bullet. The bullet entered at a downward angle.
28          Two 45-caliber bullets struck the residence at 1725 West Prospect. One 45-
     caliber bullet struck the residence next door. Three 45-caliber cartridge casings were

                                                    2

found in the street.

Approximately two minutes after the shooting, a patrol vehicle followed the Cougar down a dead-end street located about a mile from 1725 West Prospect. The Cougar stopped and four men ran out of the car. Three of the men jumped a fence but Edgar was apprehended. A nine-millimeter handgun fell out of the waistband of Edgar's pants and a police officer picked it up. It was loaded but there was no round in the chamber. Mariano and Bernabe were quickly apprehended in the surrounding area.

A .22-caliber revolver was found under the back seat of the Cougar. Nine rounds had been fired from the revolver. The front grill of the Cougar was damaged. The rear portion of the driver's window frame had gunshot residue on it. Mariano and Edgar's fingerprints were found in the Cougar.

Edgar, Mariano and Bernabe were all tested for gunshot residue. Bernabe's right hand tested positive; Edgar and Mariano did not test positive.

Bernabe admitted firing a weapon and hiding it under the back seat of the Cougar. Bernabe testified that he was frightened of the van that was following the Cougar and fired some shots 'to the ground" to scare off the van.

Appellant was arrested several weeks after the drive-by shooting.

Luma Fahouma gave expert gang testimony. The Surenos and the Nortenos are rival criminal street gangs operating in Visalia. She opined that appellant, Mariano, Edgar and Bernabe were all Sureno members. Mario is a Sureno associate. Moses was a Norteno member and Daniel was an associate of the Norteno. She also opined that a drive-by shooting of this nature would benefit the Surenos by increasing its criminal reputation and instilling fear. Fahouma also testified that two weeks prior to this drive-by shooting, a Norteno gang member shot at appellant. Finally, she testified that there was graffiti in the area reading, "187 on Marcos," which means murder Marcos.

(Doc. 33-1 at 3-5, footnotes omitted)

In addition, at the trial, both Danielle and Marie testified that they chased the red Cougar toward West Prospect. (RT Vol. 1 at 15-16, 32, 34; RT Vol. 4 at 522-526) Further ahead on West Prospect, they saw the red Cougar and saw flashes of light and believed someone was shooting at them. Id. In response, they fled the area. Id.

Likewise, Bernabe Rayo, the person who, undisputedly, was firing the .22, testified he shot "three or four" times in the direction of the van in which Danielle and Marie were driving because he was frightened by the pursuit and to discourage them from continuing to chase the Cougar. (RT Vol. 3 at 495-497, 505) He denied seeing anyone out on the street and denied shooting toward anyone standing near the street. Id; RT Vo. 3 at 508-509.

This evidence was contradicted by Edgar Rodriguez who testified variously that Bernabe was "also shooting towards the guys" (RT Vo. 2 at 202) and that he was firing "directly behind him" (RT Vol. 2 at 241), though he agreed that both Bernabe and Marcos fired "three or four" times each. Id. at 203. Notably, Edgar was impeached by his prior testimony in which he asserted at that time that Bernabe was shooting backward toward the van and asserted that "at no time" did Bernabe shoot at the

3

three men.  (RT Vol. 2 at 241-242)

The pathologist, Dr. Walter, testified that Bruce suffered a "through and through" injury, meaning the bullet passed through the body and was not found inside at the time of the autopsy.  (RT Vol. 2 at 272-273)  Dr. Walter testified the entry wound was 13 inches from the top of the crown of the head and the exit wound was 17 inches from the top of the crown of the head.  Id. at 276.  Dr. Walter testified that the exit wound was four inches lower on the body than the entrance wound and, if Mr. Bruce was in a "standard anatomic position"—meaning the "person is standing upright, arms to the side, palms forward"—the bullet traveled right to left and "slightly down." Id. at 276.  Whether the bullet actually traveled in a downward direction, he testified, depended upon the position of the body at the time he was shot. Id. at 276-277.   Notably, at the time just before the shooting, the three men—which included Bruce—were standing at the base of the driveway, near the street.  (RT Vol. 1 at 110-111, 113, 124; RT Vol. 2 at 196, 205)  At the time the shooting started, the three ran for cover and all ended up lying near the base of the converted-garage outer wall, behind a car. (RT Vol. 1 at 51-52, 65, 101, 107, 114-115; RT Vol. 2 at 205)

When asked whether the wound was more consistent with a .22 caliber bullet or a .45 caliber bullet, Dr. Walter testified, "The wound size is not a real accurate predictor of the size of the slug, but in general it would favor a larger caliber weapon, that is larger than a 22." (RT Vol. 2 at 278)  Dr. Walter agreed that a .22 caliber bullet generally caused a "small hole" and a .45 caliber bullet usually caused a "bigger hole."  Id. at 278-279.

I.     **Discussion**

A.     **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

4

1   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

2   Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v.

3   Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other

4   grounds by Lindh v. Murphy, 521 U.S. 320 (holding AEDPA only applicable to cases filed after

5   statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is governed

6   by its provisions.

7   **B.   <u>Standard of Review</u>**

8       A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the

9   petitioner can show that the state court's adjudication of his claim:

10       (1)  resulted in a decision that was contrary to, or involved an unreasonable application of,
            clearly established Federal law, as determined by the Supreme Court of the United States;
11           or

12       (2)  resulted in a decision that "was based on an unreasonable determination of the facts in
            light of the evidence presented in the State court proceeding.
13

14    28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S.

15   at 412-413.

16       A state court decision is "contrary to" clearly established federal law "if it applies a rule that

17   contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

18   that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

19   Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. at 405-406.  A state

20   court decision involves an "unreasonable application" of clearly established federal law "if the state

21   court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner."

22   Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)(per

23   curiam).

24       Consequently, a federal court may not grant habeas relief simply because the state court's

25   decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable.

26   Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).  In

27   Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an

28   "unreasonable application" of federal law is an objective test that turns on "whether it is possible that

5

fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  Only if they could not disagree may habeas relief be granted.  <u>Richter</u>, 131 S.Ct. at 786.   As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction.  <u>Richter</u>, 131 S.Ct. at 786, quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 332, n. 5 (1979)(Stevens, J., concurring in judgment).  The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  <u>Richter</u>, 131 S.Ct. at 787-788.

The second basis for federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This applies to state court decisions based on factual findings.  <u>Davis v. Woodford</u>, 384 F.3d at 637, citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  <u>Wiggins v. Smith</u>, 539 U.S. at 520; <u>Jeffries v. Wood</u>, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  <u>Id.</u>; <u>see</u> <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004), <u>cert.denied</u>, <u>Maddox v. Taylor</u>, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 979, 803 (1991); <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the

1    federal habeas court conducts "an independent review of the record...to determine whether the state

2    court [was objectively unreasonable] in its application of controlling federal law."   Delgado v. Lewis,

3    223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

4    "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."

5    Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  Moreover, where the state court fails to

6    provide a rationale for its decision, the Court must presume that all components of the claim were

7    adjudicated in the state court.  Harrington v. Richter, 131 S.Ct. at 784.  This "strong presumption" that

8    all claims were adjudicated "may be rebutted only in unusual circumstances." Johnson v. Williams,

9    ___U.S___, 133 S.Ct.1088,  1096 (2013).

10   **II.**   **Petitioner's Claims.**

11       **A.**   **There is insufficient evidence counsel provided ineffective representation**

12       Petitioner attacks his attorneys' representations in the trial court and in the court of appeal.[1]  As

13   to the trial attorney, Petitioner contends that his attorney was incompetent for failing to present

14   evidence from a ballistics expert to demonstrate that the victim could have been killed by the 22-

15   caliber weapon, rather than the 45-caliber weapon he wielded.   As to his appellate attorney, he asserts

16   this attorney should have demonstrated that his trial counsel was incompetent due to his failure to

17   present ballistics evidence.  Both contentions lack merit.

18       Effective assistance of trial counsel is guaranteed by the Sixth Amendment. Strickland v.

19   Washington, 466 U.S. 668, 685 (1984). Effective assistance of appellate counsel is guaranteed by the

20   Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).

21   Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test.

22   To prevail, Petitioner must show: 1) his counsel's performance was unreasonable under prevailing

23   professional standards; and 2) a reasonable probability of different results but for his counsel's errors.

24   Id. at 687-691.  Thus, Petitioner must show that counsel's performance fell below "an objective

25   standard of reasonableness under prevailing professional norms." Id at 687–688.  Courts must afford

26   "highly deferential" review of counsel's performance which results in a "strong presumption that

27   _____

28       [1] Petitioner fails to indicate whether he brings these claims under § 2254(d)(1) or (d)(2).  However, because there is no indication the California Supreme Court made factual determinations, it is apparent Petitioner seeks to proceed under § 2254(d)(1).

1    counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.

2          Here, there is no evidentiary support showing that a ballistic expert would have been helpful to

3    Petitioner's case.  The weight of the evidence produced at trial demonstrates that the only person

4    shooting toward the trio, was Petitioner.  (RT Vol. 2 at 200-201)  Even Edgar, who testified that

5    Bernabe shot toward the men, was impeached by his prior testimony that "at no time" did Bernabe

6    shoot toward the men but, instead, shot backward toward the van.  (RT Vol. 2 at 241-242)  This was

7    consistent with Danielle and Marie's testimony that they believed that the people in the Cougar were

8    shooting at them. (RT Vol. 1 at 15-16, 32, 34; RT Vol. 4 at 522-526)

9          The argument that it was more likely that Bernabe shot Bruce because he was closer than

10   Petitioner who shot over the top of the car, is speculative because it is not supported by any evidence.

11   Though Dennis Wright testified that, in general, the closer a shooter is to his target, the more likely he

12   is to hit the target (RT Vol. 2 at 294-295), there is no evidence that the width of the Cougar (which is

13   the approximate difference between how close Bernabe and Petitioner were to Bruce), played any role

14   in Petitioner's ability to shoot Bruce and, indeed, there is no evidence of this before this Court.  To the

15   contrary, the physical evidence demonstrated that the only bullets recovered near Bruce's body were

16   .45 caliber (RT Vol. 2 at 289, 290-291, 292; 326-327, 328-329, 330, 334) and, though the pathologist

17   testified the size of the wound is not a good indicator of the caliber of the weapon, he agreed the

18   wound was more consistent with a .45 caliber weapon than a .22.  (RT Vol. 2 at 278-279)

19         Also, the argument is unconvincing that the angle that the bullet traveled through Bruce's body

20   provides any explanation of who shot him.[2]  The bullets recovered at the scene demonstrated that

21   Petitioner was able to shoot in a downward direction given the evidence that a .45 caliber bullet was

22   found lodged about two feet from the ground, in the outer wall of the garage-conversion where Bruce

23   died.  (RT Vol. 2 at 289, 326-329)  Another .45 caliber bullet was found to be lodged "up high" on the

24   wall about 91 inches from the ground.  (RT Vol. 2 at 290-291, 292, 298, 326-329, 330, 334)  Thus, it

25   appears Petitioner was using the "pray and spray" method of shooting in which he fired off shots in a

26

27          [2]There is no evidence to support the implied claim Bruce was standing upright when he was shot such that the
     bullet traveled "downward."  For example, if Bruce was struck while diving for cover, the bullet's path may have been
28   generally parallel to the ground.

general direction without too much concern as to the specific location where the bullets would land. The fact that Petitioner was not making a calculated effort to shoot a particular target makes little difference given he pointed his weapon at a group of three men—seemingly indifferent as to which he would strike—and fired off large caliber bullets in their direction.  That he intended to shoot and kill one or more of the men is the significant fact; the method he chose for doing so, is not.

Despite Petitioner's current belief that a ballistics expert would have testified in his favor, he has presented no such evidence to support this contention.  At most, he provides speculation that this *could* have been the result.  Thus, even assuming it was unreasonable for trial counsel not to pursue this evidence, there is no showing that the jury would have found differently.  In analyzing prejudice, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Strickland</u>, 466 U.S. at 695.   Here, there is evidence of no such reasonable doubt.

Federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."   <u>Cullen</u>, 131 S.Ct. at 1398. "This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court." <u>Id</u>.  "Section 2254(b) requires that prisoners must ordinarily exhaust state remedies before filing for federal habeas relief. It would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo." <u>Id</u>. at 1399.

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.

<u>Williams v. Taylor</u>, 529 U.S. at 437.  If Petitioner fails to present his evidence to the state court, he cannot correct this failure by presenting it to the federal court instead.  Section 2254(e) provides,

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court **shall not hold an evidentiary hearing** on the claim unless the

applicant shows that--
(A) the claim relies on--
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Here, there is no showing that either exception applies and, in fact, Petitioner makes no such claim. Moreover, Petitioner has not presented *any* evidence either in the state court or in this Court. When he filed his petition for a writ of habeas corpus to the California Supreme Court, he requested an evidentiary hearing but did not present any evidence that would support that such a hearing should be permitted. He has taken a similar tact in this Court. In doing so, he seems to believe that his counsel's ruminations as to what the new ballistics evidence may show is sufficient to justify a grant of habeas corpus; not so.

Because there is no showing whatsoever that a ballistics expert would, in any fashion, agree with Petitioner's arguments, the Court cannot find the jury would have a reasonable doubt as to Petitioner's guilt and therefore, the Court recommends the petition be **DENIED**.

**B.     The record contains sufficient evidence Petitioner was the person who shot and killed the victim.**

Petitioner argues there was insufficient evidence was presented to support the jury's finding that he was the actual shooter of Bruce. This contention lacks merit.

In Jackson v. Virginia, 443 U.S. at 319, the Court held that, when determining whether a factual finding is fairly supported by the record, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Id. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

In Cavazos, v. Smith, __U.S. __, 132 S.Ct. 2, 3 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by,

[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court

10

instead may do so only if the state court decision was "objectively unreasonable." <u>Renico v. Lett</u>, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).

Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume– even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Jackson</u>, 443 U.S. at 326. "A jury's credibility determinations are therefore entitled to near-total deference." <u>Bruce v. Terhune</u>, 376 F.3d 950, 957 (9th Cir. 2004). Likewise, circumstantial evidence and inferences drawn therefrom may be sufficient to sustain a conviction. <u>Walters v. Maass</u>, 45 F.3d 1355, 1358 (9th Cir. 1995).

AEDPA requires a federal habeas court to apply the standards of <u>Jackson</u> with an additional layer of deference. <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005). This Court must also presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459, (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. <u>Tinsley v. Borg</u>, 895 F.2d 520, 525 (9th Cir.1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. <u>Sumner v. Mata</u>, 455 U.S. 539, 597 (1981).

As noted above, the evidence demonstrates that Petitioner had a gun when the foursome sped off in the red Cougar to find Northerners upon which to avenge the insult suffered by their Southerner comrade. (RT Vol. 2 at 186-187, 199-202, 222) When the group came upon three men, including Bruce, standing alongside the street at the base of a driveway, Petitioner opened fire. (RT Vol. 2 at 200-201, 238, 244-245, 247)

Though the three men fled to avoid being shot, in the melee (RT Vol. 2 at 205), Bruce was shot through the lung and heart and quickly bled to death. (RT Vol. 2 at 272-273) Near where he fell and died, two .45 caliber bullets were found lodged in a wall and one .45 caliber bullet went through the outer wall of a neighboring house and was found in a blanket inside a linen closet which was backed by the outer wall. (RT Vol. 2 at 326-327, 328-329, 330, 334) Four .45 caliber casings were found in

the street in the area from where Petitioner fired. (RT Vol.2 at 312-316)  In addition, the wound suffered by Bruce, though its size was not conclusive, was consistent with being shot by a .45 caliber bullet.  (RT Vol. 2 at 278-279)

In the car, only two people shot guns; Petitioner and Bernabe.  (RT Vol. 2 at 200-201, 238, 244-245, 247)  It was undisputed that Bernabe fired a .22 caliber gun.  (RT Vol. 3 at 495-497, 505) The jury resolved the conflict in the evidence between Bernabe and Edgar and, implicitly, adopted Bernabe's account that he was not shooting in the direction of the trio.  Thus, interpreting this evidence in favor of the verdict, the Court cannot conclude that no rational trier of fact could have found proof of guilt beyond a reasonable doubt.  Therefore, the Court recommends the petition for writ of habeas corpus be **DENIED**.

## **RECOMMENDATION**

Accordingly, the Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be **DENIED** with prejudice on its merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within 20 days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within 10 court days after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   __**October 8, 2013**__          _____**/s/ Jennifer L. Thurston**
                                                           UNITED STATES MAGISTRATE JUDGE